**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**HELEN LOUISE TORRES,**

        **Plaintiff,**

    **v.**
                        **Civil Action 2:18-cv-573**
                        **Judge James L. Graham**
                        **Magistrate Judge Jolson**

**COMMISIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Helen Louise Torres, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner.

## I.      BACKGROUND

Plaintiff filed her application for DIB in October 2014, alleging that she was disabled beginning April 10, 2013. (Doc. 10, Tr. 278–84). After her application was denied initially and on reconsideration, an Administrative Law Judge (the "ALJ") held a hearing on April 20, 2017. (Tr. 46–93). On August 11, 2017, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 10–28). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on June 8, 2018. (Doc. 1). Plaintiff filed her Statement of Errors (Doc. 11), Defendant filed an Opposition (Doc. 13), and Plaintiff filed a Reply (Doc. 14). Thus, this matter is now ripe for consideration.

## A. Relevant Hearing Testimony

Plaintiff was 56-years-old at the time of the hearing. At the hearing, Plaintiff testified about a myriad of physical and mental health conditions, including hypertensive cardiovascular disease, hypertension, seizures, epilepsy, anxiety, depression, panic attacks, posttraumatic stress disorder ("PTSD"), asthma, irritable bowel syndrome, thyroid disorder, and hypokalemia. (*See generally* Doc. 10-2). She explained that her physical conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. (Tr. 69, 83). Plaintiff testified that she can walk half-a-block at a time, stand for ten minutes at a time, and lift a maximum of ten pounds. (Tr. 69–70). Plaintiff stated that she experiences focal seizures, lasting approximately ten minutes each, three to four times daily. (Tr. 76–77). She testified to having had one grand mal seizure within the last three years. (Tr. 77). She also testified that she has migraines almost every day. (*Id*.). Plaintiff further stated that she experiences constant neck and shoulder pain, as well as back pain that radiates to her legs. (Tr. 79–80).

As for her mental health conditions, Plaintiff testified that she struggles with memory, concentration, comprehension, task-completion, and getting along with others. (Tr. 71, 81–82, 85– 86). She also testified that she has difficulties handling stress and changes in her routine. (Tr. 81–82). Plaintiff further testified that her depression has worsened and that she continues to experience panic attacks. (Tr. 81).

With regard to her daily activities, Plaintiff's children help with household chores and cooking. (Tr. 74). She spends her days at home watching TV, listening to the radio, and doing chores. (Tr. 74–75). Plaintiff explained that she uses the motorized cart while grocery shopping and that her daughter often helps her shop. (Tr. 70).

Finally, a vocational expert ("VE") testified that Plaintiff could not return to any of her previous jobs but that she could perform the light exertional jobs of garment sorter, ticket seller, and stock checker. (Tr. 89).

## B. Relevant Medical Background

###### 1. *Plaintiff's Physical Health*

Plaintiff has a history of epilepsy characterized by complex partial seizures dating back to 2010. (Tr. 459, 473). In January 2013, Plaintiff was in a car accident after having a seizure while driving. (Tr. 473). Plaintiff injured her neck in the accident, and a cervical spine computed tomography ("CT") scan revealed degenerative spondylosis with no acute traumatic deformity. (Tr. 391).

Plaintiff receives treatment from her general practitioner, Dr. Matthew Inman and his nurse practitioner, Holly Inman. Collectively, Dr. Inman and Holly Inman saw Plaintiff more than a dozen times between April 15, 2013 and January 4, 2017. (Tr. 413–485, 606–650, 788–93, 1118–1166). Plaintiff consistently complained of joint pain and stiffness, neck and back pain, difficulty concentrating, seizures, anxiety, depression, and sleep disturbances. (*See, e.g.*, Tr. 415, 423, 430, 438, 444, 451, 457, 599, 790, 1120, 1127, 1134, 1140, 1144, 1152, 1158, 1163).

With regard to her seizures, a January 2013 CT scan of the brain found no acute intracranial abnormalities with the gray white differentiation maintained. (Tr. 391–95). In July 2014, Plaintiff reported having two small seizures a week but no grand mal seizures. (Tr. 415). In January 2016, Plaintiff reported having at least three seizures per week and was assessed as having chronic migraines without aura and epilepsy, partial complex seizures. (Tr. 1061).

As for her spinal condition, on May 3, 2013, Dr. Inman ordered a lumbar spine x-ray, which showed mild degenerative changes with moderate degenerative disc disease. (Tr. 454). An August 12, 2013 lumbar spine MRI showed mild degenerative disc disease with degenerative changes of the endplate and facet joint and disc bulges at multiple levels. (Tr. 411). Examination notes from May 7, 2015, document Plaintiff's normal reflexes, unremarkable gait and station, normal strength, and normal sensation. (Tr. 920–21). Records from January 27, 2016, reveal that Plaintiff had

decreased bilateral upper and lower extremity strength, but that her tone/spasticity was within normal limits and that her bilateral upper extremity gross motor coordination was without significant impairments. (Tr. 1022–24). On March 30, 2017, a second lumbar spine x-ray revealed slightly worsened degenerative disc disease and degenerative spondylolisthesis at the L4-L5 level. (Tr. 1261). On April 10, 2017, a second lumbar MRI demonstrated moderate to severe central spinal canal stenosis at L4-L5 secondary to grade 1 spondylolisthesis, moderate bilateral facet arthropathy, ligamentous hypertrophy and mild disc bulge, moderate bilateral neuroforamina narrowing and a synovial cyst that effaced the L5 nerve root, and bilateral moderate facet arthropathy at L5-S1. (Tr. 1264–65).

Plaintiff underwent three functional capacity evaluations ("FCE"), one on July 8, 2013 (Tr. 473–76), one on January 27, 2016 (Tr. 1021–29), and one on March 6, 2017 (Tr. 1259–60). The evaluations show abnormal posture, reduced trunk rotation, and reduced cervical range of motion. (519). Annette Demos, the physical therapist who performed each FCE, limited Plaintiff to sedentary work. (Tr. 474, 1024, 1260).

Dr. Inman completed an administrative form regarding Plaintiff's physical capabilities, upon which he opined that Plaintiff was limited to sitting and standing or walking for 30 minutes to two hours on a sustained basis due to back pain. (Tr. 784). He also limited Plaintiff to lifting less than ten pounds and reported that she is unable to do any of the following: remember locations/procedures; maintain attention/concentration; sustain ordinary routine; carry out instructions; perform activities within a schedule; and interact with the general public. (*Id.*). Finally, Dr. Inman opined that Plaintiff is unable to work either full or part time. (*Id.*).

2. *Plaintiff's Mental Health*

In addition to her physical conditions, Plaintiff also suffers from mental health conditions,

including PTSD, anxiety, and paranoia (Tr. 798), which she says stem from her ex-husband's emotional and physical abuse. (Tr. 459, 769). For her mental health treatment, Plaintiff primarily sees Dr. Surinder Singh for medication management and licensed therapist Tiffany DeHaven for counseling, though Dr. Inman and Holly Inman also provide mental health treatment to Plaintiff. Dr. Singh and DeHaven collectively treated Plaintiff on more than twenty occasions from May 17, 2013, to February 14, 2017. (Tr. 491–526, 763–64, 799–805, 822, 839–45, 867–68, 986–89, 996–97, 1180–1198).

Treatment notes reveal that Plaintiff's mental health fluctuated. In April 2013, Plaintiff did not do well answering questions directly, became easily sidetracked, and seemed anxious. (Tr. 452). In July 2013, Plaintiff reported that her depression had improved but that she still struggled with anxiety. (Tr. 444). Examination notes indicate that Plaintiff was anxious but cooperative and polite. (*Id.*) November 2013 treatment records reveal that Plaintiff's mood had suffered with stressors but that she was compliant with her medications, appeared well-groomed, and had normal thought process and associations. (Tr. 517). The records go on to show that her concentration was low at times but that her memory had no impairments and that her judgment and insight were fair. (*Id.*) November 2014 notes show that Plaintiff had a depressed mood and constricted affect, but appeared well groomed, with normal speech, normal thought process, goal-oriented associations, and no impairment in memory. (Tr. 806–07). Examination records from December 2014 indicate that Plaintiff showed confusion about her medications, had a tearful and depressed affect, and was argumentative at times. (Tr. 792). May 2016 examination records show that Plaintiff had limited judgment and insight and a low mood but no impairment in memory and a well-groomed general appearance. (Tr. 1193). November 2016 records show that Plaintiff had normal comprehension, repetition, speech, and judgment. (Tr. 1080).

On December 3, 2014, Dr. Inman prepared a narrative report, wherein he described Plaintiff's history of seizures, sexual abuse, and PTSD. (Tr. 779). Dr. Inman stated that Plaintiff does not have "the ability to focus, [cannot] concentrate on tasks for longer than a half hour at a time," and has an impaired memory as a result of her seizures. (*Id*.). He further opined that Plaintiff would often forget what was discussed during appointments and could not be trusted to "handle money or any other task where critical thinking is involved" because she cannot "be relied upon to consistently perform a task." (*Id*.).

On December 15, 2014, DeHaven and Dr. Singh completed a Mental Impairment Questionnaire. (Tr. 796–800). Plaintiff's mental health diagnoses were listed as the following: major depressive disorder (single episode, severe), dysthymia, and chronic PTSD. (Tr. 796). Dr. Singh and DeHaven cited the following clinical findings to support their assessment of Plaintiff's mental health problems: depressed mood, persistent or generalized anxiety, abnormal affect, feelings of guilt or worthlessness, hostility/irritability, difficulty thinking or concentrating, easy distractibility, flight of ideas, poor memory, intrusive recollections of a traumatic experience, paranoia/suspiciousness, persistent irrational fears, recurrent panic attacks, vigilance and scanning, anhedonia/pervasive loss of interests, decreased energy, deeply ingrained and maladaptive patterns of behavior, intense and unstable interpersonal relationships, motor tension, pathological dependence, passivity or aggressiveness, psychomotor abnormalities, social withdrawal or isolation, and sleep disturbances. (Tr. 797). DeHaven and Dr. Singh assessed Plaintiff with marked limitations across a number of subcategories relating to understanding and memory, concentration and persistence, social interactions, and adaptation. (Tr. 800). They estimated that Plaintiff would be absent from work as a result of her impairments or treatment more than three times per month. (*Id*.).

On December 17, 2015, DeHaven completed a Disability Impairment Questionnaire. (Tr. 1011–1015). She noted that Plaintiff was "extremely and irrationally fearful of intruders" and that her symptoms would likely interfere if placed in a competitive environment. (Tr. 1012, 1014). DeHaven also opined that Plaintiff experiences trauma triggers, fearfulness, hypervigilance, social problems, problems with attention and concentration, depression, and tearfulness that contribute to the severity of symptoms and functional limitations. (Tr. 1015). She further opined that Plaintiff would be absent from work more than three times per month. (*Id.*).

On March 1, 2017, Dr. Singh completed the same questionnaire and opined that Plaintiff is unable to work due to depression, anxiety, trauma history, memory, task completion problems, severe problems with social interactions, stress, and problems dealing with mild conflicts, as well as physical health problems and seizures preventing her from driving that worsen with stress. (Tr. 1177). He also opined that Plaintiff has problems handling money due to attention and fast-paced requirements and has difficulty completing tasks. (*Id.*). He reported that Plaintiff has marked limitations in understanding and memory and in all areas of concentration and persistence except moderate to marked in her ability to make simple work-related decisions. (Tr. 1176). Finally, he opined that Plaintiff has generally marked limitations in both social interactions and her ability to respond appropriately to workplace changes. (*Id.*).

3.        **The ALJ's Decision**

The ALJ found that Plaintiff had not engaged in substantial gainful employment during the period from her alleged onset date of April 10, 2013, through her date last insured of December 31, 2016. (Tr. 13). The ALJ determined that Plaintiff suffered from the following severe impairments: seizures, degenerative disc disease and degenerative changes of the endplate and facet joints with disc bulges, migraines, degenerative changes of the cervical spine, major

depressive disorder, posttraumatic stress disorder, adult sexual abuse, and panic without agoraphobia. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 13–15).

With regard to her mental impairments, the ALJ noted that while Plaintiff alleges that she has difficulty remembering, following instructions, completing tasks, and taking medications without reminders, she is still able to prepare meals, pay bills, attend doctor's appointments, and shop. (Tr. 14). After consideration of the evidence, however, the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 17).

With reference to Plaintiff's spinal issues, the ALJ concluded that Plaintiff's "conservative treatment, independent gait, and normal sensation and coordination do not support totally disabling spinal conditions." (Tr. 19). Concerning her seizure disorder, the ALJ concluded that "with medication management, [Plaintiff's] treatment records indicate that [she] went nearly a yearly [sic] without a seizure [ ] and that her headaches were well controlled' with medications." (Tr. 18) (internal quotations and citations omitted). And, with regard to her mental health conditions, the ALJ concluded that Plaintiff's "conservative mental health treatment does not support a totally disabling mental health condition," noting that she has never been hospitalized for her mental health conditions and, on occasion, went months at a time without receiving mental health treatment. (Tr. 20). Moreover, the ALJ found that "treatment records indicate that with medication compliance and treatment she made 'good' progress, had 'less confusion,' and 'no impairment' in memory." (*Id.*).

Turning to the opinion evidence, the ALJ assigned "little weight" to the opinion of Dr. Amrick Chatta, who opined that Plaintiff would have psychological limitations in her ability to

work at a regular job on a sustained basis and that her conditions were likely to produce good days and bad days. (Tr. 21). The ALJ found Dr. Chatta's assessment "not particularly probative" because it did not offer[] any specific functional limitations, but rather [] offered generalized statements regarding [Plaintiff's] ability to work." (*Id*.).

Next, the ALJ assigned "little weight" to treating source, Dr. Inman's opinions, explaining that it was "not supported by the longitudinal medical evidence of record" and that treatment records show that Plaintiff's mental health symptoms had improved with medication compliance. (Tr. 22).

The ALJ also assigned "little weight" to nurse practitioner Holly Inman's opinion, explaining that she "is not an acceptable medical source" and that "her statements provide no insight into the development of a residual functional capacity." (*Id*).

The ALJ then assigned "partial weight" to the opinion of Dr. Casanova, who opined that Plaintiff could not work at heights, work with machines that require an alert operator, or operate a motor vehicle, and that Plaintiff's symptoms were periodically severe enough to interfere with attention and concentration. (Tr. 23). The ALJ explained that Dr. Cassanova's limitations were supported by Plaintiff's history of seizures, but that "his opinions provid[ed] only some insight into the development of a residual functional capacity, as he did not specifically classify the [plaintiff's] limitations and did not defined [sic] what the periodical limitations would entail." (*Id*.).

Next, the ALJ assigned "little weight" to Dr. Singh's opinion regarding Plaintiff's mental health conditions. The ALJ stated again that "the longitudinal medical evidence of record does not support the severity of limitations assessed by Dr. Singh" and that Plaintiff showed improvement with medication compliance. (Tr. 25). The ALJ also stated that Dr. Singh was likely

relying on Plaintiff's subjective statements "rather than the objective medical evidence of record," and that Dr. Singh "did not provide explanation as to why [Plaintiff] would be absent from work for such significant periods of time." (*Id.*).

The ALJ went on to assess the opinions of Plaintiff's therapist, Tiffany DeHaven. The ALJ assigned "little weight" to DeHaven's first opinion (that she authored with Dr. Singh) and "partial weight" to her second opinion. (Tr. 22–23). The ALJ explained that DeHaven "did not provide explanation as to why [Plaintiff] would be absent from work for such significant periods of time" and "provid[ed] only some insight into the development of a residual functional capacity." (*Id.*).

Finally, the ALJ assigned "significant weight" to both State agency consultants. First, the ALJ assigned "significant weight" to State agency consultant, Gary Hinzman, who stated that Plaintiff was able to perform a range of light work with postural and environmental limitations. (Tr. 25). The ALJ also assigned "significant weight" to State agency consultant, Dr. Carl Tisher, who did not personally examine Plaintiff, but found that she had mild restrictions in activities of daily living, mild restrictions in social functioning, moderate restrictions in maintaining concentration, persistence and pace, and no episodes of decompensation. (Tr. 26).

Based upon his analysis, the ALJ fashioned the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the work must: entail no climbing of ladders, ropes, or scaffolds, crouching or crawling; avoid concentrated exposure to vibration, fumes, dust, odors, gases, and poor ventilation; avoid all hazards of moving plant machinery and unprotected heights; be limited to simple unskilled work in a low stress work setting with no rapid production or assembly line work and few changes in the work setting.

(Tr. 16).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.    DISCUSSION

Plaintiff raises three errors to the Court. (Doc. 11). First, Plaintiff argues that the ALJ erred by failing to properly evaluate her treating sources' opinions. (*Id.* at 8–18). Second, Plaintiff contends that the ALJ erred because he failed to pose adequate hypothetical questions to accommodate for her limitations in concentration, persistence, and pace. (*Id.* at 18–19). Third, Plaintiff argues that the ALJ improperly evaluated her subjective symptoms. (*Id.* at 19–20).

### A.    Treating Physician Rule

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case

record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'" *Blakely* 581 F.3d 399 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d at 243 (alterations in original)). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, Plaintiff argues that the ALJ erred in this two-step analysis as to the opinions of Drs. Matthew Inman and Surinder Singh. Plaintiff also claims that the ALJ erred in discrediting the opinion of her licensed therapist, Tiffany DeHaven. The Undersigned will address each of these arguments in turn.

### 1. Drs. Inman and Singh

First, Plaintiff argues that the ALJ erred in assigning "little weight" to the opinions of Drs. Inman and Singh. Specifically, Plaintiff contends that the ALJ's assessment of their opinions is unsupported by the record and also that the ALJ failed to consider the relevant regulatory factors in weighing a treating source opinion. (Doc. 11 at 10–17; Doc. 14 at 3–7). The Court agrees.

With regard to Dr. Inman's opinion, the ALJ stated that Dr. Inman's physical limitations, were "not supported by the longitudinal medical evidence of record that indicates that claimant has sought no more than conservative physical treatment, not requiring surgical intervention and she retained an independent gait, and normal sensation and coordination." (Tr. 22). The ALJ also discredited Dr. Inman's opinion concerning Plaintiff's mental health, explaining that "the longitudinal medical evidence of record indicates that the claimant's mental health conditions are not as limiting as assessed" and that treatment records indicated that Plaintiff had made "'good' progress, had 'less confusion,' and 'no impairment' in memory." (*Id*.).

With regard to Dr. Singh's opinion, the ALJ again stated that the "longitudinal medical evidence of record does not support the severity of [his] limitations[.]" (Tr. 25). The ALJ elaborated on his finding:

> In fact, records subsequent indicate that with medication compliance and treatment, Plaintiff made 'good' progress, had 'less confusion,' and 'no impairment' in memory.' Additionally, Dr. Singh's statement that these were 'per client,' indicate to the undersigned that Dr. Singh was relying on the claimant's subjective statements rather than the objective medical evidence of record. Notably, Dr. Singh

also did not provide explanation as to why the claimant would be absent from work for such significant periods of time.

(*Id*.) (internal citations omitted).

The Court finds that the ALJ failed at both steps of the treating physician rule. To start, the ALJ failed to conduct a controlling weight analysis. The Commissioner concedes that the ALJ did not "explicitly state" that Drs. Inman and Singh were treating sources, but nonetheless argues that because the ALJ discussed their treatment records, it is "clear" that the ALJ was aware that they were treating sources. (Doc. 13 at 13). This argument misses the mark. It is not clear from the ALJ's opinion that he gave any deference at all, under the treating physician rule, to Drs. Inman and Singh. Instead, the ALJ dismissed their opinions, concluding that they were inconsistent with other evidence in the record. But the mere fact that an ALJ "find[s] that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley*, 581 F.3d at 408 (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *4). Here, because the ALJ did not weigh the treating physicians' opinions under the appropriate deferential standard, the ALJ failed to satisfy the first step of the treating physician rule.

The ALJ also failed to provide "good reasons," at the second step of the treating physician rule. If the ALJ does not give a treating source's opinion controlling weight, he must balance several "factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Cole*, 661 F.3d at 937 (quoting *Wilson*, 378 F.3d at 544). "This requirement is not simply a formality," *id*., but is a "procedural" safeguard that "serves both to ensure adequacy of

review and to permit the claimant to understand the disposition of h[er] case." *Friend*, 375 F. App'x at 550–51.

Here, there is no indication that the ALJ engaged in a meaningful review of the relevant regulatory factors when assessing Drs. Inman's and Singh's opinions. Even a cursory examination of the relevant factors reveal that Dr. Inman treated Plaintiff more than a dozen times between April 15, 2013 and January 4, 2017, and that Dr. Singh and DeHaven collectively treated Plaintiff on more than twenty occasions from May 17, 2013 to February 14, 2017. (*See supra* at 3–7). Further, the opinions of Plaintiff's treating sources, along with the opinions of DeHaven, are largely consistent with one another. (*See id*.). Given these factors, the ALJ's explanation for dismissing Drs. Inman's and Singh's opinions falls short of what is required under the "good reasons" standard.

Moreover, none of the ALJ's explanations are persuasive. For instance, rather than "identify[ing] the specific discrepancies" between Dr. Inman's opinion and the medical record, the ALJ repeated the bare-boned statement that the doctor's opinions were "not supported by the longitudinal medical evidence of record" (Tr. 21–22), and the ALJ relied on three seemingly arbitrary pieces of evidence—that Plaintiff had a normal gait, sensation, and coordination. (Tr. 22).

Equally unpersuasive, the ALJ stated, for both Drs. Inman's and Singh's opinions, that Plaintiff's mental health showed improvement with medication management. (Tr. 22, 25). The ALJ also noted that Dr. Singh probably based his opinion on Plaintiff's subjective statements and that his opinion did not account for why Plaintiff would miss so much work. (Tr. 22, 25). The Court finds these explanations unconvincing.

To start, the Court has engaged in an independent review of the record and finds that the record suggests that Plaintiff's mental health symptoms fluctuated. (*See supra* at 5–6). Regardless, the ALJ's characterization of Plaintiff's mental health symptoms as having "improved" does not excuse his failure to weigh the relevant regulatory factors. *See, e.g.*, *McQueen v. Comm'r of Soc. Sec.*, No. 1:13-cv-88, 2014 WL 533496, at *9 (S.D. Ohio Feb. 11, 2014), *report and recommendation adopted*, No. 1:13-cv-88, 2014 WL 879880 (S.D. Ohio Mar. 5, 2015) (finding the ALJ's reliance on plaintiff's "improvement" did not constitute "good reasons" and noting that "[u]nder the ALJ's logic, any improvement in one's mood, regardless of how small and from what level the individual improved, would defeat a claim of mental impairment."). Further, the Court is perplexed by the ALJ's statement that Dr. Singh did not explain why Plaintiff would be absent from work. Dr. Singh set out a myriad of work-related difficulties and challenges related to Plaintiff's mental health, all of which could potentially result in her absence from work. (*See supra* at 5–7). Finally, the ALJ's statement that Dr. Singh's opinion is likely based on Plaintiff's subjective statements does not satisfy the "good reasons" standard. Such a "conclusory comment, without any elaboration or detail, does not satisfy the procedural requirements for rejecting a treating physician's opinion[.]" *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009) (noting that "psychology and psychiatry are, by definition, dependent on subjective presentations by the patient").

In sum, the ALJ failed to analyze the relevant regulatory factors and his opinion does not reflect an "effort to identify the *specific* discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Gayheart*, 710 F.3d at 377 (emphasis added). In other words, the ALJ's decision does not provide the Plaintiff and this Court "a clear

understanding of the reasons for the weight given to [the doctor's] opinion." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 805 (6th Cir. 2011) (quoting *Friend*, 375 F. App'x at 551).

The Commissioner resists this conclusion, arguing that substantial evidence in the record supports the ALJ's decision. That, however, is not the question at this stage. While a "treating physician's opinion can be properly discounted if there is substantial medical evidence to the contrary," *Dyer*, 568 F. App'x at 426, an ALJ must always provide "good reasons" in articulating why she or he discounted the treating physician's opinion in the first place. Said differently, "[t]he administrative law judge must [still] give 'good reasons' for the weight—or lack of weight—given a treating physician's opinion." *Id.* If the ALJ does not, as is the case here, then it does not matter whether substantial evidence supports the ALJ's conclusion. *Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.").

In certain circumstances, however, an ALJ's failure to give good reasons for rejecting the opinion of a treating source may constitute *de minimis* or harmless error. *Wilson*, 378 F.3d at 547. *De minimis* or harmless error occurs: (1) if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of the procedural safeguard of the good reasons rule even though an ALJ has not complied with the express terms of the regulation. *Id.* at 547. Importantly, the Commissioner has not argued that standard is satisfied here. Further, the Undersigned concludes that none of the harmless-error factors apply here.

2. *Licensed Therapist Tiffany DeHaven*

Plaintiff also contends that the ALJ erred in assigning "little weight" to the opinion of his licensed therapist, Tiffany DeHaven. While the ALJ's treatment of Drs. Inman's and Singh's opinions alone warrants remand, it is also worth briefly noting the ALJ's treatment of DeHaven's opinion.

As a licensed therapist, DeHaven is not an "acceptable medical source" pursuant to Social Security Ruling SSR 06-03P; instead she is an "other source." *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939.[1] "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function." *Id.* at *2. Such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file." *Id.* at *4. Accordingly, the ruling explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion. *Id.* at *4–5. An ALJ may also consider the degree to which the source presents relevant evidence to support the opinion, whether the source has a particular expertise, and "any other factor supporting or refuting the opinion." *Davila v. Comm'r of Soc. Sec.*, 993 F. Supp. 2d 737, 757–58 (N.D. Ohio 2014) (internal quotation marks and citations omitted).

Here, it is unclear whether the ALJ analyzed DeHaven as a treating physician or an "other source." He refers to DeHaven as both "Ms. DeHaven" and "Dr. DeHaven" and does not state that she is not an acceptable medical source, despite having done so in the preceding paragraph as to nurse practitioner, Holly Inman's opinion. (*See* Tr. 22–23).

---

[1] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

Regardless, the ALJ's explanation for discounting DeHaven's opinions fails to pass muster under either standard. When assessing DeHaven's and Dr. Singh's 2014 opinion, the ALJ relies on the fact that Plaintiff made "good" progress with medication management and states that the opinion did not explain why Plaintiff would be absent from work for such significant periods of time. (Tr. 22). In assigning DeHaven's 2015 opinion only partial weight, the ALJ states again that DeHaven does not explain why Plaintiff would be absent from work so much and provides the vague explanation that her opinions "provide only some insight into the development of a residual functional capacity." (Tr. 23). As noted above, both DeHaven and Dr. Singh provide detailed reports of Plaintiff's mental health symptoms, all of which could arguably contribute to Plaintiff's potential absences from work. Moreover, the ALJ does not weigh the relevant standards for assessing an "other source" opinion. Had the ALJ done so, he may have analyzed DeHaven's opinion differently, especially considering the significant amount of time Plaintiff saw DeHaven and the fact that DeHaven's opinion is consistent with Plaintiff's other treating sources.

Taking all of the above into account, the Court finds that substantial evidence does not support the ALJ's non-disability determination. In such a situation, "the Court must determine whether to remand the matter for rehearing or to award benefits." *Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp. 3d 912, 923 (S.D. Ohio 2016). "Generally, benefits may be awarded immediately 'if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.'" *Id*. at 924 (quoting *Faucher v. Sec'y of Health & Human Servs*., 17 F.3d 171, 176 (6th Cir. 1994)). A court should only award benefits in a case "where proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where proof of disability is overwhelming." *Id*. The Court finds that proof of disability is not overwhelming. *See id.* Upon

remand, the ALJ should properly consider and discuss the opinions of Drs. Inman and Singh, as well as licensed therapist, Tiffany DeHaven, and provide an explanation that is consistent with the regulations when assigning weight to those opinions.

**B.      The Remaining Assignments of Error**

Plaintiff also argues that the ALJ failed to formulate adequate hypotheticals and improperly evaluated Plaintiff's subjective symptoms.  However, the Court's decision to recommend reversal and remand on the first assignment of error alleviates the needs for analysis on Plaintiff's remaining assignments of error.  Nevertheless if the recommendation is adopted, the ALJ may consider Plaintiff's remaining assignments of error on remand if appropriate.

**IV.      CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner.

**V.      PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:  May 1, 2019                                      /s/ Kimberly A. Jolson
                                                        KIMBERLY A. JOLSON
                                                        UNITED STATES MAGISTRATE JUDGE